UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OZAN WILLIAMS,

                  Plaintiff,

        v.

DELTA BAROMETRE, *et al.*,

                Defendants.

No. 20-CV-7644 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Ozan Williams
Otisville, NY
*Pro Se Plaintiff*

Maria B. Hartofilis, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

      Ozan Williams ("Plaintiff"), proceeding pro se, brings this Action, pursuant to 42 U.S.C.

§ 1983, Title II of the Americans with Disabilities Act ("Title II" or "ADA"), 42 U.S.C. § 12131,

*et seq.*, Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.*, against the New

York State Department of Corrections and Community Supervision ("DOCCS") and DOCCS

Superintendent Delta Barometre ("Barometre"; collectively, "Defendants"), alleging that

Defendants were deliberately indifferent to his serious medical needs, improperly penalized him

as a result of his hearing impairment, and failed to reasonably accommodate his disabilities

under the ADA and RA.  (*See generally* Complaint ("Compl.") (Dkt. No. 2).) [1, 2]  Plaintiff expressly and repeatedly states that he seeks only injunctive relief, not monetary damages.[3]  Before the Court is Defendants' Motion To Dismiss the Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Not. of Mot. (Dkt. No. 19).)

   For the reasons stated herein, the Motion is granted in part and denied in part.

---

[1] Because the Complaint does not use consistent pagination, and because it is broken up into a form portion as well as several attached exhibits, the Court refers simply to the ECF-stamped pages in the top-right corner.

[2] "[T]he precise theory of the claim is not articulated with great precision," but instead "largely consists of a narrative of events," *Mulvihill v. Ontario County*, No. 13-CV-6268, 2014 WL 12902275, at *2 (W.D.N.Y. Feb. 13, 2014), *on reconsideration in part*, 2014 WL 1843463 (W.D.N.Y. May 8, 2014), as laid out in a chronology along with several documents to substantiate it.  But where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)).  Accordingly, the Court evaluates all possible claims the Complaint could be interpreted to raise, including the aforementioned constitutional, ADA, and RA claims.

[3] With respect to relief, Plaintiff writes: "The plaintiff is requesting an Order to Prison Officials for action to improve his medical condition of confinement based upon medical standing. Thereby the plaintiff is seeking an injunction/equitable relief," (Compl. 6); "This case and its addressment for resolution is not a remedy of law circumstances such as monetary damages which would be inadequate," (*id.*); "The Temporary Restraining Order is the only way to immediately address and medically correct and prevent further damage as the digress continues," (*id.* at 7); "The plaintiff has clearly shown that immediate and irreparable injury damage/loss will result to this movant before the concluding of this court case, thereby the plaintiff seeks a Temporary Restraining Order," (*id.*).  Accordingly, the Court does not consider money damages in its analysis, only the injunctive relief sought.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiff's Complaint and the exhibits therein as well as Plaintiff's opposition papers and the exhibits therein.[4]  They are assumed to be true for the purpose of resolving the instant Motion.

_____

[4] In his memorandum opposing Defendants' Motion, Plaintiff makes additional factual allegations giving rise to new claims.  (*See generally* Pl.'s Mem. of Law in Opp. of Def. ("Pl.'s Opp.") (Dkt. No. 21); *see also* Def.'s Reply Mem. of Law in Further Supp. of Mot. ("Def.'s Reply Mem.") 1–8 (Dkt. No. 22) (describing Plaintiff's new allegations and claims).)  It is true that the Court's "mandate to read the papers of pro se litigants generously makes it appropriate to consider [a] plaintiff's additional materials, such as his opposition memorandum."  *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997) (citing *Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)); *see also Veras v. Jacobson*, No. 18-CV-6724, 2020 WL 5659551, at *1 n.1 (S.D.N.Y. Sept. 23, 2020) ("The Court properly considers factual allegations contained in [the] [p]laintiff's opposition papers and other materials submitted by [the] [p]laintiff to the extent that those allegations are consistent with the Amended Complaint."), *reconsideration denied*, 2020 WL 6694410 (S.D.N.Y. Nov. 13, 2020); *Norman v. Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *1 (S.D.N.Y. July 31, 2020) (same); *Burgess v. Goord*, 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) (same) (citing *Gadson*, 1997 WL 714878, at *1 n.2).

Notwithstanding the Court's authority to consider new facts, however, such new facts must relate to the original wrongdoing alleged.  *See Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018) ("A pro se plaintiff may not raise 'entirely new' causes of action for the first time in his opposition papers, but the Court may consider new claims appearing for the first time in briefing if 'the claims could have been asserted based on the facts alleged in the complaint.'" (italics omitted) (quoting *Vlad-Berindan v. MTA New York City Transit*, No. 14-CV-675, 2014 WL 6982929, at *5 (S.D.N.Y. 2014))) (collecting cases).

In his Opposition, Plaintiff newly asserts a handful of facts regarding misbehavior reports stemming from him being out of line due to his inability to hear an order.  (*See generally* Pl.'s Opp.)  The Court will consider these as having salience to the original issues alleged.  But the remainder—which is to say the vast majority—of new allegations Plaintiff makes are unrelated to the claims in this case: that a corrections officer—one who is neither named nor referenced in the original complaint—conducted an improper search and inappropriately seized Plaintiff's property; that Plaintiff filed a grievance about said search; and that the corrections officer is now harassing Plaintiff in retaliation for filing said grievance.  (*See* Pl.'s Opp. Mem. 2–3; 12–23.)  "Because [this subset of Plaintiff's] new allegations go well beyond merely elaborating on the facts alleged in the Complaint and apparently are intended to support new legal theories, the

On August 27, 2008, prior to Plaintiff's incarceration, Plaintiff was admitted to University Hospital in Staten Island.  (Compl. 3; *see also id.* at 13.)  Plaintiff avers that he was assaulted, sustaining injuries on his head, face, abdominal, and both wrists.  (*See id.* at 3; *see also id.* at 13.)  Specifically, Plaintiff asserts that he was assaulted by a police officer.  (*See id.* at 3.) "While admitted [Plaintiff underwent several] examinations, [including a] CT scan."  (*Id*.) Plaintiff was also provided multiple medications as treatment.  (*See id.*)  Lastly, "[t]here was a report made of a head assault and multiple contiguous axial images were obtained from the base of the skull to the vertex."  (*Id.*)

Several years later in 2012, Plaintiff alleges that there was an audiologist report made concerning Plaintiff's hearing issues.  (*See id*.)

The following year, in 2013, Plaintiff was incarcerated.[5]  While incarcerated, on August 26, 2013, the OTO Health Hearing Aid Center ("OTO") sent Plaintiff hearing aids.  (*See* Compl.

---

Court declines to consider them here."  *Mira v. Argus Media*, No. 15-CV-9990, 2017 WL 1184302, at *3 n.4 (S.D.N.Y. Mar. 29, 2017); *see also Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (summary order) (affirming that a new constitutional challenge raised in opposition briefing was properly dismissed because the complaint did not "encompass that claim."); *Trombetta v. Novocin*, No. 18-CV-993, 2021 WL 6052198, at *11 (S.D.N.Y. Dec. 21, 2021) ("It is well-established that a party may not raise new claims in its opposition brief."), *reconsideration denied*, 2022 WL 280986 (S.D.N.Y. Jan. 31, 2022); *Pandozy v. Segan*, 518 F. Supp. 2d 550, 554 n.1 (S.D.N.Y. 2007) ("Although [the plaintiff] raises additional claims in his opposition papers, the Court will not consider these new claims as they were not raised in the amended complaint."), *aff'd*, 340 F. App'x 723 (2d Cir. 2009); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers.").  Should he choose, Plaintiff is free to file one or more separate causes of action pertaining to these allegations.

[5] "The business records exception provides that a record of a 'regularly conducted activity' is admissible for the truth of the matter where the record was made contemporaneously by someone with knowledge, the record was kept in the regular course of business and as a

at 3; *see also id.* at 23.)  In the letter denoting the delivery of Plaintiff's hearing aids, OTO

requested permission for Plaintiff to keep his hearing aids in his possession at all times, stating

that it is "a matter of medical necessity and [required] for his personal security and quality of

life."  (*Id.* at 23; *see also id.* at 3.)

On or around December 14, 2013, Plaintiff reached out to the First Deputy

Superintendent and Acting Superintendent regarding his hearing aids.  (*See id.* at 3; *id.* at 22.)

Several days later, on December 24, 2013, Plaintiff received confirmation that "a notice of

---

regular practice, a qualified witness testifies to those facts, and the records are trustworthy."
*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d
Cir. 2016); *see also United States v. Murgio*, No. 15-CR-769, 2017 WL 365496, at *12
(S.D.N.Y. Jan. 20, 2017) ("Federal Rule of Evidence 803(6) permits admission into evidence of
'business records' for the truth of the matters asserted." (citing *United States v. Kaiser*, 609 F.3d
556, 574 (2d Cir. 2010)).

Because prison records meet the above-listed requirements, "[j]udicial notice may be
taken of prison records pursuant to Fed. R. Evid. 803(6)."  *Martinez v. New York State Dep't of
Corr.*, No. 12-CV-1499, 2013 WL 5194054, at *2 n.1 (S.D.N.Y. Sept. 16, 2013); *see also Gray
v. Erfe*, No. 13-CV-39, 2015 WL 3581230, at *2 n.1 (D. Conn. June 5, 2015) ("The court may
take judicial notice of prison records.");  *McEachin v. Selsky*, No. 04-CV-0083, 2010 WL
3259975, at *13 n.13 (N.D.N.Y. Mar. 30, 2010) ("[T]hese records to which we take judicial
notice are prison records which fall into the business records exception to the hearsay rule, found
in Federal Rule of Evidence 803(6)"), *report and recommendation adopted*, 2010 WL 3259982
(N.D.N.Y. Aug. 17, 2010).  Moreover, "[c]ourts may also take judicial notice of information
contained on websites where "the authenticity of the site has not been questioned."  *Fernandez v.
Zoni Language Centers, Inc.*, No. 15-CV-6066, 2016 WL 2903274, at *3 (S.D.N.Y. May 18,
2016), *aff'd*, 858 F.3d 45 (2d Cir. 2017) (quoting *Hotel Employees & Rest. Employees Union,
Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks &
Recreation*, 311 F.3d 534, 549 (2d Cir. 2002)).  For that reason, courts have held that a court
"will take judicial notice of the records posted by the New York State Department of
Correctional Services as to [a] plaintiff."  *Ligon v. Doherty*, 208 F. Supp. 2d 384, 386 (E.D.N.Y.
2002).

According to DOCCS's online records, Plaintiff's incarceration began in 2013.  *See
Inmate Information, Department of Corrections and Community Supervision, New York State
Gov't*, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130.  The Court therefore
takes judicial notice of this fact.

addressment for hearing aids" was received, and then forwarded to "Dr. Malvarosa, Facility Health Services Director."  (*Id.* at 22.)

On April 2, 2015, Plaintiff filed a grievance "based upon the hearing aids."  (*Id.* at 3.) The following day, the grievance was returned to Plaintiff.  (*Id.* at 24.)

On April 12, 2015, Plaintiff wrote to Superintendent Michael Capra ("Capra"), requesting that Plaintiff's January and February 2015 disciplinary hearings be overturned because Plaintiff's hearing aids were malfunctioning.  (*Id.* at 25.)  Two weeks later on April 28, 2015, Capra denied Plaintiff's request, saying that an "[i]nvestigation shows that [his] hearing aids were working." (*Id.*)[6]

On November 24 and 25, 2015, Plaintiff was seen by medical staff at his Sing Sing correctional facility.  (*Id.* at 28.)  Per a letter from Susanna Nayshuler ("Nayshuler"), Regional Health Services Administrator, in March 2016, Plaintiff was concerned about his hearing at the time of these November 2015 visits.  (*See id.*)  Nayshuler wrote that the Sing Sing medical staff had already addressed Plaintiff's concerns and claimed that an audiology specialist described Plaintiff's hearing loss as "non-significant."  (*Id.*)

On March 4, 2016, the Regional Health Services Administrator "provided a notice of an investigation without medical confirmation of [P]laintiff's medical status."  (*Id.* at 5.)

On April 18, 2016, Plaintiff was issued another misbehavior report.  (*See id.* at 32.)[7]

---

[6] Neither the Complaint nor subsequent submissions include a copy of this original request.  The Court is only aware of the request based on seeing Capra's letter denying the request.  (*Id.*)

[7] The Court does not have a copy of this letter but is aware of it by reference in a subsequent grievance appeal.  (*See id.* (noting that Plaintiff "did not appeal his 4/18/16 Tier II misbehavior report").)

6

Plaintiff avers that on May 2, 2016, "a grievance determination was issued [following] a hearing investigation" and held Plaintiff at fault. (*Id.* at 5.)[8] Additionally, Plaintiff alleges that there was a "follow up" scheduled soon thereafter. (*Id.*) On May 10, 2016, Plaintiff's grievance appeal was deemed "not an appealable decision." (*Id.* at 31.)

On June 13, 2016, the Legal Aid Society wrote to the Ombudsperson for the Office of Counsel at DOCCS, Nancy Heywood ("Heywood"), on Plaintiff's behalf regarding his inability to hear and its supposed connection to his misconduct. (*See id.* at 26.) Heywood responded to this correspondence on August 25, 2016. (*See id.*)[9]

On November 3, 2016, a misbehavior report detailing Plaintiff's misconduct was issued, (*see id.* at 27 (noting Plaintiff's misbehavior on November 3, 2016, at approximately 7:53 a.m.)), though Plaintiff avers that the behavior at issue, namely his "refusal of a direct order," was solely the result of his "inability to properly hear" rather than intentional non-compliance, (*id.* at 5).

On December 5, 2016, Plaintiff filed a grievance in which he stated that he was told by medical personnel that he was placed on "a waiting list for his hearing aids, because they were not repaired yet," (*id.*), but that he keeps getting tickets because his hearing aids have not been repaired, (*id.* at 30). Plaintiff alleges that two weeks later, on December 19, 2016, "the facility medical staff refused to have the hearing aids repaired, which [a]ffects [Plaintiff's] ability to hear and follow orders of staff." (*Id.* at 5.)

---

[8] Plaintiff is not clear as to what, specifically, was addressed in this grievance.

[9] The Court does not have a copy of Plaintiff's original or Heywood's August 25, 2016, response, but is aware of it by reference in a subsequent letter sent by the Legal Aid Society. (*See id.*)

On December 19, 2016, Plaintiff also received another letter from the Legal Aid Society discussing its aforementioned correspondence with Heywood and requesting further information regarding his inability to obtain new hearing aids, including when he last contacted medical personnel, their response, and the nature of the tickets he has received due to his disability-related conduct.  (*Id.* at 26.)  No discussion of Plaintiff's response to this letter is detailed among the materials submitted.

On January 18, 2017, "a hearing notice was provided to plaintiff from Albany Central Office for new hearing aids."  (*Id.* at 5.)  On the same day, the Central Office Review Committee ("CORC") of the Inmate Grievance Program ("IGP") received Plaintiff's appeal.  (*See id.* at 33.)

On January 27, 2017, Plaintiff's December 5, 2016, grievance (Grievance No. SS-57297-16), was denied by the Superintendent, stating that "[i]nvestigation reveals grievant was seen 12/20/16 by the audiologist, after which the audiologist advised grievant's primary care provider he has no hearing loss."  (*Id.* at 30.)  Four days later, on February 1, 2017, Plaintiff then filed an appeal seeking a second opinion and alleging that "Dr. Serhan is telling [him] one thing and doing another]" insofar as telling him his hearing aids will be replaced but then suggesting that he does not have hearing loss."  (*Id.*)  This appeal was received by the CORC on March 3, 2017. (*See id.* at 36.)

At an undetermined time in early 2017, Plaintiff once again reached out to the Legal Aid Society regarding his hearing aids and treatment at Sing Sing.  (*See id.* at 29.)[10]  In response, the

---

[10] The Court does not have a copy of this letter but is aware of it by reference in a subsequent letter sent by the Legal Aid Society.  (*See id.*)

Legal Aid Society wrote to Sing Sing on Plaintiff's behalf on February 16, 2017.  (*See id.*)[11]  The

following month, on March 13, 2017, the Legal Aid Society wrote Heywood once more.  (*See*

*id.*)  In this second correspondence, the Legal Aid Society notes that Plaintiff stated he "saw Dr.

Serhan at Sing Sing Correctional Facility in December 2016 and January 2017 to have his

hearing aids repaired, but they still have not been repaired," notwithstanding filing several

grievances and contacting medical staff since the February 16, 2017, letter.  (*Id.*)[12]

On September 7, 2017, Karen Bellamy, an IGP Director, issued a memorandum to

Plaintiff advising him that his appeal of Grievance No. SS-56508-16 was received in January of

2017, as noted above.  (*Id.* at 33.)  Ultimately, Plaintiff's December 5, 2016, grievance was

reviewed by CORC in late 2017.  (*Id.* at 32.)  Following a hearing on October 25, 2017, CORC

"accepted in part" the actions Plaintiff requested.  (*Id.*)  Specifically, CORC

> noted that [Plaintiff] was seen by his provider 9 times between 3/2/16 and 10/5/17
> for various issues, including his hearing aids.  In addition, he was seen by the
> audiologist on 12/20/16, who determined that no follow up was needed at that time,
> however, he is scheduled for a follow up appointment in the near future.  CORC
> has not been presented with evidence of improper medical misbehavior or
> malfeasance by staff.  CORC notes that the grievant did not appeal his 4/18/16 Tier
> II misbehavior report and advises him that he is solely responsible for his actions
> while in the Department's custody.

(*Id.*)

---

[11] The Court does not have a copy of this letter but is aware of it by reference in a
subsequent letter sent by the Legal Aid Society.  (*See id.*)

[12] The bottom of the Legal Aid Society's letter was inadvertently cut off, meaning the
Court cannot ascertain who from the organization wrote to Heywood.  (*See id.* at 29.)

On January 16, 2018, Shelley Mallozzi, another IGP Director, issued a second memorandum to Plaintiff advising him that his appeal of Grievance No. SS-57297-16, was received by the CORC. (*See id.* at 36; *see also id.* at 12.)[13]

On October 20, 2018, another inmate misbehavior report was issued against Plaintiff stating Plaintiff lied to an officer about being authorized to go to the law library. (*See id.* at 34; *see also id.* at 5, 12.) Once again, Plaintiff avers that the "misbehavior report was written based upon [P]laintiff['s] malfunctioning hearing aids and the misinterpreted permission given to be in the law library, this was taken as a false statement by [P]laintiff, when he never heard correctly." (*Id.* at 5.)

Plaintiff received an additional misbehavior report on March 2, 2019. (*See id.* at 40; *see also id.* at 5, 12.) Specifically, the report states that Plaintiff failed to comply with verbal orders to participate in the inmate count process. (*See id*. at 40.) This occurred once more on June 4, 2019, wherein Plaintiff was issued a misbehavior report due to his failure to comply with verbal orders to participate in the inmate count process. (*See id.*; *see also id.* at 5, 12.)

In October 2019, Plaintiff was transferred from the Sing Sing Correctional Facility to the Otisville Correctional Facility. (Pl.'s Opp. 1.) While at Otisville, on January 28, 2020, Plaintiff received a seemingly similar writeup, having been accused of being out of place. (*See id.*; *see also id.* at 9–10.) Plaintiff then appealed this decision. (*Id.* at 2; *see also id.* at 9–10.) Plaintiff

---

[13] Two additional things occurred shortly after Plaintiff received this Memorandum, which Plaintiff notes in his filing but which do not appear to bear on the question before the Court: 1) On April 3, 2018, Plaintiff wrote to attorney Adam Perlmutter, "his appellate attorney" on his state matter, to "address[] . . . the false advocacy of the defense, when [P]laintiff was deaf and unaware of the trial procedure in its entirety," (*id.* at 5; *see also id.* at 35); and 2) on April 10, 2018, Plaintiff created a case plan with a case officer at Sing Sing detailing Plaintiff's goals, which included obtaining new hearing aids, (*see id.* at 37–38).

avers that this decision was affirmed by Barometre on February 20, 2020.  (*See id.* at 2.)
However, the documents Plaintiff attached as Exhibit A to the Complaint show that the appeal
was affirmed by "[Deputy Superintendent Noeth]."  (*Id.* at 10.)

On May 4, 2020, Plaintiff received a letter from DOCCS Deputy Superintendent of
Programs Stevenson ("Stevenson"), who confirmed "receipt of [Plaintiff's] letter regarding a
Tier II misbehavior report" he sought to have "removed from [his] record."  (Compl. 42.)
Stevenson confirmed that "there is nothing that can be done on [his] end.  [Plaintiff] went
through the proper appeal process with the Superintendent/Designee and that decision was
affirmed.  There is no avenue above that for a Tier II appeal."  (*Id.*)

Nine days later, on May 13, 2020, DOCCS Deputy Commissioner Anne Marie McGrath
("McGrath") wrote to Plaintiff again "in reference to [his] recent correspondence regarding a
misbehavior report."  (*Id.* at 41.)  McGrath also made clear that Plaintiff was required to go
through the proper channels to appeal his grievance.  (*See id.*)

B.  Procedural Background

Plaintiff's Complaint was docketed on September 17, 2020.  (Dkt. No. 2.)  His request to
proceed in forma pauperis was granted on October 19, 2020.  (Dkt. No. 7.)  On January 11, 2021,
Defendants filed a letter motion in anticipation of filing a motion to dismiss.  (Dkt. No. 15.)  Two
weeks later, the Court set a briefing schedule.  (Dkt. No. 16.)

Defendants filed the instant Motion on March 1, 2021.  (Not. of Mot.; Defs.' Mem. of
Law in Supp. of Def.'s Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 20).)  Plaintiff's response,
self-styled as a "Reply to Defendants Opposition Letter," was filed on March 8, 2021.  (Pl.'s
Opp.)  Defendants filed a Reply on April 20, 2021.  (Def.'s Reply Mem.; Decl. of Deanna L.

Collins ("Collins Decl.") (Dkt. No. 23).)

On June 15, 2021, Plaintiff submitted a letter motion requesting appointment of counsel. (Dkt. No. 27.)  The following month, on July 14, 2021, the Court granted Plaintiff's request. (Dkt. No. 28.)  However, despite repeated, diligent efforts by the Court as well as the Southern District of New York's Office of Pro Se litigation, Plaintiff was unable to secure counsel. Accordingly, because Plaintiff filed a brief in opposition to the Motion on his own behalf, the Court considers this Motion fully briefed.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if

a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[]

complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense. But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

　　　"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot.

Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d

306, 317 (S.D.N.Y. 2016) (same). But when a plaintiff proceeds pro se, as stated above, the

Court may consider "materials outside the complaint to the extent that they are consistent with

the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at

*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).  Moreover, again stated *supra*, where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes*, 723 F.3d at 403 (quotation marks omitted).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

## B.  Analysis

Defendants move to dismiss the Complaint on several grounds.  First, Defendants argue that Plaintiff's § 1983 claims against DOCCS must be dismissed under the Eleventh Amendment.  (*See* Defs.' Mem. 5.)  Defendants further argue that Plaintiff's § 1983 claims against Barometre fail to allege a claim.  (*See id.* 5–10.)  Defendants also argue that Barometre is entitled to qualified immunity against such claims.  (*See id.* 10–11.)  With respect to Plaintiff's claims under the ADA and RA, Defendants argue that Plaintiff lacks standing, that his claims are moot, and that he fails to state a claim.  (*See id.* 11–13.)

Plaintiff does not substantively grapple with these claims in his Opposition; rather, Plaintiff recites the facts at issue, argues that he has complied with the New York Court of Claims Act, and focuses on the newly raised claims regarding his wrongful search and seizure.

14

(*See generally* Pl.'s Opp.)  Defendants therefore respond to such charges, asserting the Court

should not hear them and that even if the Court were to consider them, such claims are futile.

(*See* Defs.' Reply Mem. 1–8.)  Moreover, Defendants assert that Plaintiff's failure to respond

constitutes abandonment, meriting dismissal.  (*See id.* at 8–10.)[14]

### 1.  Constitutional Claims

#### a.  Barometre

"It is well settled that, in order to establish a defendant's individual liability in a suit

brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal

involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d

133, 138 (2d Cir. 2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a report or appeal, failed
> to remedy the wrong, (3) the defendant created a policy or custom under which

---

[14] It is true that "[c]ourts in this Circuit have presumed that plaintiffs have abandoned
their claims when they do not oppose a motion to dismiss them."  *Thurmand v. Univ. of
Connecticut*, No. 18-CV-1140, 2019 WL 369279, at *3 (D. Conn. Jan. 30, 2019) (citing *Hanig v.
Yorktown Central School District,* 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005)).  This principle
has been adopted "even in cases where the plaintiff was proceeding pro se."  *McNair v. Ponte*,
No. 16-CV-1722, 2019 WL 1428349, at *6 (S.D.N.Y. Mar. 29, 2019) (collecting cases).  But as
the Second Circuit has instructed (albeit in another context, but nonetheless awarding a pro se
litigant the benefit of the doubt):

> Implicit in the right to self-representation is an obligation on the part of the court to
> make reasonable allowances to protect pro se litigants from inadvertent forfeiture
> of important rights because of their lack of legal training.  While the right "does not
> exempt a party from compliance with relevant rules of procedural and substantive
> law," *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981), it should not be impaired
> by harsh application of technical rules.

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (italics omitted).  Thus, using the Second
Circuit's pronouncement as its lodestar, "the Court nevertheless addresses the merits in light of
Plaintiff's pro se status."  *Bradshaw v. City of New York*, No. 15-CV-2166, 2017 WL 6387617,
at *4 n.6 (E.D.N.Y. Aug. 22, 2017).

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id*. at 139 (alterations, citation, and italics omitted).   Said otherwise, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.   Therefore, Plaintiff must plausibly allege that a specific individual defendant's actions fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff's Complaint does not specifically articulate the claims alleged, namely which constitutional protections Barometre may have violated.   A review of the facts alleged, however, speak—albeit loosely—to allegations of Eighth and Fourteenth Amendment violations.   Accordingly, the Court reviews each to determine if Plaintiff has sufficiently alleged Barometre's involvement.

## i.  Eighth Amendment

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A deliberate indifference claim contains two requirements.   The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious.   The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care.   This means that the charged

16

> official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.  Officials need only be aware of the risk of harm, not intend harm.  And awareness may be proven from the very fact that the risk was obvious.

*Id.* (citations and quotation marks omitted).

Applying these two requirements to the case at bar, the Second Circuit has stated that "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

To the extent Plaintiff alleges an Eighth Amendment violation insofar as failing to address any issues of his hearing aids, neither Plaintiff's Complaint nor his Opposition Papers nor their respective exhibits meet this burden.  It is true that Plaintiff makes loose allegations that Plaintiff's harms with respect to his hearing aids remain unaddressed while at Otisville under Barometre's supervision, (*see* Pl.'s Opp. 2 ("as of this date plaintiffs hearing aid has yet to be fixed and no one has made the initiative to address [P]laintiff[']s issues"); *id.* ("Otisville is not getting the medical needs of prisoners done in a timely manner."), which the Court interprets as an ongoing or continuing harm subject to injunctive relief pursuant to the Supreme Court's *Ex Parte Young* doctrine, *see Vega v. Semple*, 963 F.3d 259, 282 (2d Cir. 2020) ("This alleged ongoing constitutional violation—deliberate indifference to serious medical needs of incarcerated persons—is the type of continuing violation for which a remedy may permissibly be fashioned under *Ex parte Young*.").  However, the Court agrees with Defendants' contention that Plaintiff fails to allege any fact suggesting Barometre's involvement in any decisions regarding Plaintiff's hearing aids denoting non-compliance.

17

As Defendants observe: Plaintiff's original hearing issues arise from an incident prior to Plaintiff's incarceration, (*see* Defs.' Mem. 6 (citing Compl. 13–21, 23).)  Subsequent allegations regarding improper or contrary medical decisions with respect to his hearing aids pertain almost exclusively to decisions undertaken by staff at Downstate, (*see* Compl. 22), or Sing Sing, (*see id.* at 24–40).  Barometre is the Superintendent of Otisville facility, an entirely distinct facility from either Downstate or Sing Sing.

The only particular allegations that pertain to Plaintiff's incarceration at Otisville speak to one misbehavior report that he alleges is the result of not following an order he could not hear. (*See* Pl.'s Opp. 1–2.)  Again, Plaintiff alleges that Barometre was involved insofar as she affirmed the decision at issue.  (*See id.* at 2 ("Plaintiff was found guilty of said charge and timely appealed such decision to defendant Barometre.  On February 20, 2020, defendant [Barometre] affirmed the decision, thus disregarding plaintiffs medical issue pertaining to his hearing loss, which prevented him from hearing said staff officer's directions.").)

However, the documents Plaintiff attached as Exhibit A to the Complaint show that the appeal was affirmed by "[Deputy Superintendent Noeth]," not Barometre.  (*Id.* at 10). Barometre instead concurred with Plaintiff's grievance for sake of the new allegations not before the Court.  (*See id.* at 19.)  In other words, Plaintiff confuses the grievance affirmance with which Barometre is involved.

"Where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true."  *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 681 (S.D.N.Y. 2019) (alterations omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d

Cir. 2011)).  Therefore, the Court cannot accept Plaintiff's allegation that Barometre affirmed his grievance.

Only one document seems to suggest Barometre may have been quasi-involved in this specific grievance and therefore aware of Plaintiff's medical issues: in writing to Plaintiff about this misbehavior report, McGrath copied the Superintendent of Otisville—presumably Barometre.  (Compl. 41.)  But "'mere receipt' of a letter, complaint or grievance from an inmate, and the recipient's subsequent inaction, is insufficient to establish a claim of personal involvement by a correctional supervisor."  *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (collecting cases); *see also Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) (citing *Harris*, 2008 WL 953616, at *9).  Moreover, this correspondence says not a word regarding Plaintiff's hearing; rather, it speaks generally to the grievance process and the "appropriate" grievance and appeals mechanisms.  (*See* Compl. 41.)  "Thus, in this case, because [P]laintiff fails to allege any conduct by [Barometre] beyond the receipt of [P]laintiff[']s letter[], [P]laintiff[']s claims under [§] 1983 against [Barometre sounding in deliberate indifference] must be dismissed."  *Harris*, 2008 WL 953616, at *9.[15]

---

[15] Even assuming, arguendo, that Barometre was aware of Plaintiff's medical situation, there is no allegation that Barometre "play[ed] either a direct or supervisory role in [Plaintiff's] treatment, and therefore cannot be held liable for any deficiencies in [his] medical care." *Ocampo v. Fischer*, No. 11-CV-4583, 2018 WL 1513627, at *5 (E.D.N.Y. Mar. 27, 2018) (quoting *De Jesus v. Albright*, No. 08-CV-5804, 2011 WL 814838, at *6 (S.D.N.Y. Mar. 9, 2011)); *see also Cuoco v. Moritsugo*, 222 F.3d 99, 111 (2d Cir. 2000) (holding that prison warden was not liable for alleged failure to intervene because he "had [no] authority to intervene in an admittedly medical decision" made by doctors); *Brown v. McElroy*, 160 F. Supp. 2d 699, 704 (S.D.N.Y. 2001) (dismissing claims § 1983 claims against government officials arising from alleged Eighth Amendment violations where the "officials had no authority over the medical

Accordingly, Defendants' Motion regarding Plaintiff's claims under § 1983 regarding any Eighth Amendment violation is granted, and Plaintiff's claims on these grounds are dismissed.

<u>ii.  Fourteenth Amendment</u>

The Court construes Plaintiff as having pled a violation of the Fourteenth Amendment, having been deprived of an interest—namely facing punishment for his reprimands—without due process of law.  (*See generally* Compl., Pl.'s Opp.)

There is no question that incarceration curtails an inmate's rights.  "But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.  There is no iron curtain drawn between the Constitution and the prisons of this country."  *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974).  To that point, "[p]risoners may also claim the protections of the Due Process Clause.  They may not be deprived of life, liberty, or property without due process of law."  *Id.* at 556 (collecting cases).  Thus, "[t]o state a due process claim, plaintiff must plausibly allege '(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.'"  *Jabot v. MHU Couns. Roszel*, No. 14-CV-3951, 2016 WL 6996173, at *7 (S.D.N.Y. Nov. 29, 2016) (quoting *Giano v. Selsky*, 238 F.3d

---

decisions concerning [the plaintiff] and that their alleged refusal to interfere in [the plaintiff's] treatment was neither prohibited by federal law nor objectively unreasonable").  What's more, even if Barometre was aware of Plaintiff's medical situation and could take action, and was also plausibly alleged to be supervising Plaintiff's treatment, "a prison administrator is permitted to rely upon and be guided by the opinion of medical personnel concerning the proper course of treatment administered to prisoners,'" *Ocampo*, 2018 WL 1513627, at *5 (quoting *De Jesus*, 2011 WL 814838, at *6), which would also nullify any suggestion that Barometre acted with the requisite culpable mental state—recklessness, *see Spavone*, 719 F.3d at 138—and consequently undermine any Eighth Amendment claim.

223, 225 (2d Cir. 2001)).  And as relevant here, "[p]rison discipline implicates a liberty interest

when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life.'"  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v.

Conner*, 515 U.S. 472, 484 (1995)).

In the first instance, the Court does not find that Plaintiff's liberty interest has been

infringed upon.

> The prison inmate has no constitutionally guaranteed immunity from being falsely
> or wrongly accused of conduct which may result in the deprivation of a protected
> liberty interest.  [D]ue process required that he be granted a hearing on whatever
> charges had been made against him.

*Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).  Said more succinctly, "[a] prisoner does

have a due process right to a hearing before he may be deprived of a liberty interest on the basis

of a misbehavior report."  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing

*Freeman*, 808 F.2d at 951).  Plaintiff does not allege that he was never given a hearing to

challenge his misconduct reports, meaning he cannot be said to have been deprived of his due

process rights for sake of failing to receive a hearing.

Due process protections also attach to the information provided pursuant to the hearing.

> As the Supreme Court has held, due process requires that in a disciplinary hearing
> resulting in imposition of loss of good time credits or solitary confinement, an
> inmate must be afforded advance written notice of the charges against him and a
> written statement of fact findings supporting the disposition and reasons for the
> disciplinary action taken.

*Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999).  Plaintiff does not allege that he was not

given such information.  In fact, Plaintiff fails to "allege *any* facts" whatsoever with respect to

"the hearing[s] . . . following the misbehavior reports"—including the specific punishment that

befell him at the hearing as a result of the misbehavior report—let alone that they were "unfair."

*Boddie*, 105 F.3d at 862 (emphasis added).  Accordingly, Plaintiff cannot be said to have been deprived of his due process rights insofar as the substance of his hearings are concerned.

The same is appropriately said with respect to the misbehavior reports themselves, which must adequately detail the wrongdoing at issue as well as "the date, time and place of the incident."  *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 608 (S.D.N.Y. 2009) (emphasis omitted) (quoting 7 N.Y.C.R.R. § 251–3.1(c)(3)).  Plaintiff does not allege that any such report was deficient in failing to provide this information.  In sum, the Court agrees with Defendants that Plaintiff fails to allege any facts showing that he was deprived of his due process rights.  (*See* Defs.' Mem. 9.)

Moreover, Plaintiff fails to allege Barometre's involvement so as to give rise to constitutional claims against her.  "Interestingly, '[c]ourts within the Second Circuit are split over whether . . . an allegation [that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability for supervisory officials.'"  *Samuels v. Fischer*, 168 F. Supp. 3d 625, 643 (S.D.N.Y. 2016) (alterations in original) (quoting *Scott v. Frederick*, No. 13-CV-605, 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8, 2015)).  Even if the Court were to afford Plaintiff the benefit of the doubt, Plaintiff's exhibits undermine his claim.

As detailed above, Plaintiff was written up several times for being out of place, allegedly as a result of his inability to hear orders dictating his actions.  (*See generally* Compl.)  Only one such report was issued while Plaintiff was incarcerated at Otisville, the facility Barometre runs: a report issued on January 28, 2020.  (*See* Pl.'s Opp. 1; *see also id.* at 9, 10.)  Plaintiff appealed this decision.  (*Id.* at 2; *see also id.* at 9, 10.)  Plaintiff avers that this decision was affirmed by Barometre on February 20, 2020.  (*Id.* at 2.)  And, once again noted above, Plaintiff's allegation

as to Barometre's involvement in his hearings "is contradicted by a document attached to the complaint," meaning "the allegation is not accepted as true." *Nat'l Credit Union*, 410 F. Supp. 3d at 681 (S.D.N.Y. 2019) (quoting *Amidax*, 671 F.3d at 147). Therefore, the Court cannot accept Plaintiff's allegation that Barometre was even involved in the grievance of appellate process.

Absent that connection, Barometre is only implicated via her supervisor role broadly, but "mere linkage in the prison chain of command is insufficient to implicate a commissioner of corrections or a prison superintendent in a § 1983 claim." *Styles v. Goord*, 431 F. App'x. 31, 33 (2d. Cir. 2011) (summary order) (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). Accordingly, Defendants' Motion regarding Plaintiff's claims under § 1983 regarding any Fourteenth Amendment violation is granted, and Plaintiff's claim on these grounds is dismissed. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (dismissing claims against DOCS Commissioner where his personal involvement was limited to receiving two letters from plaintiff); *A'Gard v. Perez*, 919 F. Supp. 2d 394, 407 (S.D.N.Y. 2013) ("Because there was no due process violation in the plaintiff's discipline, the claims against [defendant prison supervisor involved in the disciplinary hearing] must also be dismissed."); *id.* ("Because [two prison supervisor defendants] were not personally involved in the plaintiff's discipline, the claims against these two defendants are dismissed for lack of personal involvement."); *cf. Feick v. Fleener*, 653 F.2d 69, 75 (2d Cir. 1981) ("Since the documents upon which appellants based their claim show on their face absence of any grounds for relief, dismissal was proper.").

### b.  DOCCS

The Eleventh Amendment of the United States Constitution states: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "This withdrawal of jurisdiction effectively confers an immunity from suit."  *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).  "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state."  *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)).  Additionally, § 1983 does not override a state's Eleventh Amendment immunity.  *See Quern v. Jordan*, 440 U.S. 332, 340–42 (1979).  The Second Circuit has echoed this holding.  *See Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) ("[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006))).

There exist "only three exceptions to this rule": a State's waiver of the defense, congressional abrogation of the immunity, and claims seeking prospective injunctive relief.  *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015).  "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983."  *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*,

557 F.2d 35, 40 (2d Cir. 1977)); *see also Sabino v. Dep't of Corr. & Cmty. Supervision*, No. 19-
CV-7268, 2019 WL 3858622, at *1 (S.D.N.Y. Aug. 16, 2019) (same).

The final exception, a claim seeking prospective relief, emanates from the Supreme

Court's decision in *Ex parte Young*, 209 U.S. 123 (1908).  *See In re Deposit Ins. Agency*, 482

F.3d 612, 617 (2d Cir. 2007).  In *Ex parte Young*, the Supreme Court held that individual state

officials—as separate from the state itself—could be enjoined from enforcing violations of the

law prospectively.  *See* 209 U.S. at 142–168.  "[T]he [*Ex Parte Young*] doctrine remains a

landmark of American constitutional jurisprudence that operates to end ongoing violations of

federal law and vindicate the overriding 'federal interest in assuring the supremacy of that law.'"

*In re Deposit Ins. Agency*, 482 F.3d at 618 (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

But this doctrine, "regarded as carving out a necessary exception to Eleventh Amendment

immunity, . . . is narrow," applying only for "prospective relief" and "against state officers."

*P.R. Aqueduct & Sewer Auth.,* 506 U.S. at 146.  In other words,

> a plaintiff seeking prospective relief from the state must name as defendant a state
> official rather than the state or a state agency directly, even though in reality the
> suit is against the state and any funds required to be expended by an award of
> prospective relief will come from the state's treasury.

*Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991); *see also*

*Palmer v. New York State Off. of Ct. Admin.*, 526 F. App'x 97, 99 (2d Cir. 2013) (summary

order) ("[The plaintiff's] claim for prospective injunctive relief. . . fails because she neglected to

name a state official acting in his or her official capacity as a defendant.  [The Plaintiff] was

required to do so in order to attempt to avail herself of the exception to Eleventh Amendment

immunity under *Ex parte Young*" (citing *Santiago*, 945 F.2d at 32)); *cf. State Emps. Bargaining*

*Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (stating that the *Ex parte Young*

exception required a plaintiff sue "*a state official* acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." (emphasis added) (quoting *In re Deposit Ins. Agency*, 482 F.3d at 617)); *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Lab.*, 107 F.3d 1000, 1006 (2d Cir. 1997) ("[t]he best explanation of *Ex parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against *state officers* who are threatening to violate the federal Constitution or laws." (emphasis added)).

"DOCCS, as an arm of the state, stands in the same position as the State of New York." *White v. New York*, No. 19-CV-0543, 2019 WL 2578270, at *1 (S.D.N.Y. June 24, 2019). Accordingly, *Ex Parte Young* does not apply, and Plaintiff's constitutional claims against DOCCS are barred by the Eleventh Amendment.  *See Santiago*, 945 F.2d at 32 (dismissing claims for injunctive relief against DOCCS because it did not abide by *Ex parte Young* exception's requirement that the claims be directed at an official); *Marino v. City Univ. of New York*, 18 F. Supp. 3d 320, 329 (E.D.N.Y. 2014) (dismissing constitutional claims for injunctive relief against City University as an "arm[] of the state" because the Eleventh Amendment applied but the *Ex parte Young* exception did not); *Grossman v. Suffolk Cty. Dist. Att'y's Off.*, 777 F. Supp. 1101, 1103 (E.D.N.Y. 1991) (dismissing a claim for injunctive relief because "a plaintiff seeking prospective relief from a state must name as a defendant a state official rather than a state or a state agency"); *accord Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002) (holding that the plaintiff's claims, seeking injunctive relief "under 42 U.S.C. § 1983 fail because a state and its agencies are not 'persons.'  [And because] [the plaintiffs] sued only state agencies, not officials, there is no basis for invoking *Ex parte Young*"); *Stevens v. Gay*, 864 F.2d 113, 115

(11th Cir. 1989) (holding that in a § 1983 action, "[t]he Eleventh Amendment bars this action against the Georgia Department of Correction and Board of Corrections . . . regardless of whether the plaintiff seeks money damages or prospective injunctive relief"). Therefore, Defendants' Motion pertaining to Plaintiff's claims against DOCCS under §1983 arising from alleged constitutional violations is granted, and Plaintiff's claims in this realm are dismissed.[16]

### 2. ADA and RA Claims

In broad strokes, Defendants argue that Plaintiff's claims are barred by applicable statutes of limitations and speak inappropriately only to past events, thereby vitiating standing. (*See* Defs.' Mem. 12–13.)[17] In their reply brief, Defendants also argue that Plaintiff fails to state a claim against Barometre for sake of her lack of involvement and fails to state a claim against

---

[16] Defendants also argue that Barometre is entitled to qualified immunity. (*See* Defs.' Mem. 10–11; Defs.'s Reply Mem. 8.) The Court will not opine on whether he is entitled to qualified immunity, however, because Plaintiff has not plausibly pled that he is entitled to relief in his constitutional claims. *See Posr v. City of New York*, No. 10-CV-2551, 2013 WL 2419142, at *10 n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher*, 569 F. App'x 32 (2d Cir. 2014).

[17] Defendants also assert that that no employee of DOCCS, including Barometre, were "motivated in their actions by any discriminatory animus or ill will due to Plaintiff's disability," thereby foreclosing an ADA or RA claim. (Defs.' Reply Mem. 4.) The Court wishes to flag for Defendants apposite Second Circuit precedent, to which this Court is bound, that expressly holds: "While claims for damages under Title II require proof of discriminatory animus, claims for injunctive relief demand no such showing. Because [P]laintiff[] seek[s] injunctive rather than monetary relief, [he] *need not establish discriminatory animus* to succeed on [his] claim." *Davis v. Shah*, 821 F.3d 231, 260 n.19 (2d Cir. 2016) (citation omitted) (emphasis added).

DOCCS because "there are no allegations of any DOCCS policy that precludes him from getting

his hearing aids repaired and/or their needed batteries." (Defs.' Reply Mem. 4.)[18, 19]

---

[18] Plaintiff fails to articulate whether he is suing Barometre in her individual or official capacity. "[T]he statutory language of the ADA provides only for 'public entity' liability" and, therefore, "precludes ADA claims against state officials in their individual capacities." *Randolph v. Rodgers*, 253 F.3d 342, 348 (8th Cir. 2001). However, the Second Circuit has previously held that "there is no basis for holding that the ADA or Rehabilitation Act intended to create the kind of comprehensive enforcement scheme that would preclude prospective injunctive relief against a state official in her official capacity." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 289 (2d Cir. 2003). Indeed, "an individual sued for injunctive relief in his or her official capacity is effectively a 'public entity' subject to liability under the ADA because the government is the real party in interest in an official capacity suit." *Monroe v. Gerbing*, No. 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017). Accordingly, the Court cannot simply dismiss Plaintiff's claims against under the ADA or RA against Barometre specifically in her official capacity.

[19] As noted above, Defendants allege Plaintiff lacks standing to assert his claims. (Defs.' Mem. 12–13.) While standing is a universal concern, Defendants specifically make this argument when discussing Plaintiff's ADA and RA claims, so the Court responds in kind.
A plaintiff seeking injunctive relief must plead that he or she "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted) (holding that while plaintiff had standing to pursue monetary damages for prior wrongdoing, he lacked standing to pursue injunctive relief); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Plaintiff alleges, albeit loosely, that issues with his hearing aids remain unaddressed. (*See* Pl.'s Opp. 2 (alleging that, "as of this date plaintiffs hearing aid has yet to be fixed and no one has made the initiative to address [P]laintiff[']s issues"); *id.* ("Otisville is not getting the medical needs of prisoners done in a timely manner.").)
Plaintiff remains incarcerated and obviously remains subject to corrections officers' audible orders in his day-to-day life. Indeed, it would be untenable to argue that Plaintiff was immune from such orders, as corrections officers receive "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). In other words, Plaintiff plausibly alleges facts "that might give rise to the fear of a repeat encounter with [corrections] officers." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). Coupling this potential for "continuing, present adverse effects," *O'Shea*, 414 U.S. at 496, with the

In relevant part, Title II provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "The Supreme Court has held that Title II extends to inmates in state prisons."  *Monroe*, 2017 WL 6614625, at *14 (citing *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)).  Similarly, § 504 of the Rehabilitation Act protects a "qualified individual with a disability" from exclusion of participation, denial of benefits, or subjection to discrimination based on the individual's disability "under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Once again, § 504 has also "been held to apply to state prisoners."  *Monroe*, 2017 WL 6614625, at *14 (citing *Keitt v. New York City*, 882 F. Supp. 2d 412, 425 (S.D.N.Y. 2011)).

As the above-recited language makes clear, the ADA and the RA are "nearly identical." *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).  There are two main differences between the statutes.  First, the scope of the statutes is slightly different, i.e. what institutions are subject to either provision.  Specifically, all public entities are subject to Title II, whereas Section 504 of the RA applies only to those institutions "receiving Federal financial assistance."  *Henrietta D.*, 331 F.3d at 272 (quoting 29 U.S.C. §794(a)); *accord Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1180 (9th Cir. 1999) ("Unlike the Rehabilitation Act, Title

---

comparatively lesser requirements to plead standing at the Motion to Dismiss stage, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation" (italics omitted)), the Court finds that, at this early stage in the litigation, Plaintiff has alleged sufficient facts to establish standing for his claims for prospective injunctive relief.

II applies to all public entities, whether or not they receive federal financial assistance.").

Second, the statutes differ with regard to the causation required to allege a violation.

Specifically, "the reach of the Rehabilitation Act is limited to denials of benefits 'solely by

reason of . . . disability,' while the ADA applies more broadly to such denials 'by reason of . . .

disability.'"  *Schine by Short v. New York State Off. for People with Developmental Disabilities*,

No. 15-CV-5870, 2017 WL 9485650, at *4 (E.D.N.Y. Jan. 5, 2017) (quoting 29 U.S.C. § 794(a);

then quoting 42 U.S.C. §12132) (emphasis and alterations in original), *report and*

*recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017).  Where these "subtle

distinctions . . . are not implicated[,] [courts] 'treat claims under the two statutes identically.'"

*Wright v. N.Y.S. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quoting *Henrietta D.*, 331 F.3d

at 272); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (stating that,

where these two differences were not implicated, the two statutes "impose identical

requirements" (citing *Lincoln Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167 (2d Cir.

1998))); *Monroe v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2818, 2019 WL

4688665, at *9 (S.D.N.Y. Sept. 25, 2019) ("Section 504 of the Rehabilitation Act imposes nearly

identical requirements [as Title II], and courts may conduct the analysis congruently."); *Andino*

*v. Fischer*, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010) ("Unless a distinction is pertinent, the

Second Circuit treats claims under the two statutes identically.").  Because neither distinction is

afoot—prisons are subject to both the ADA and the RA, *Monroe*, 2017 WL 6614625, at *14, and

Plaintiff alleges that the only source of the discrimination is his disability, (*see generally* Compl.;

Pl.'s Opp.)—the Court similarly analyzes them simultaneously here.

To state a claim under the ADA and the RA, a plaintiff must plausibly allege that: (1) he is a "qualified individual" with a disability; (2) the defendants are subject to the ADA and the RA; and (3) he was discriminated against "by reason of" his disabilities.  *See Henrietta D.*, 331 F.3d at 272 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).  Given that prisons are indisputably subject to the ADA and RA, *Monroe*, 2017 WL 6614625, at *14, the Court need only concern itself with the second and third prongs.  The Court reviews each in turn.

### a.  Qualified Individual

Pursuant to this second prong, i.e. whether a plaintiff is a "qualified individual with a disability," the ADA defines "disability" to include, inter alia, "a physical or mental impairment that substantially limits one or more major life activities."  *Hamilton v. Westchester County*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)).  Regarding the scope of the term "disability," the Second Circuit summarized it thusly:

> The definition of "disability" under the ADA was previously interpreted narrowly. In 2008, however, Congress passed the ADA Amendments Act (the "ADAAA"), which broadened the definition of "disability" under the ADA. As this Court has noted, "[t]he principal purpose of the ADAAA was to overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one."

> With this purpose in mind, the ADAAA instructs that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard."  Relatedly, the term "substantially limits" is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA.

*Hamilton*, 3 F.4th at 92 (citations omitted); *see also Doherty v. Bice*, No. 18-CV-10898, 2021 WL 4219696, at *2 (S.D.N.Y. Sept. 15, 2021) (explaining the ADAAA's role in expanding the

definition of "qualified individual" for purposes of ADA claims), *objections overruled*, 2021 WL
5630816 (S.D.N.Y. Dec. 1, 2021).

In regulations promulgated by the Attorney General, "hearing impairments" are expressly
named as a form of "[p]hysical or mental impairment." 28 C.F.R. § 35.108(b)(2)(i). Moreover,
the regulations also defined "hearing" as a "[m]ajor life activity," *id.* § 35.108(c)(1)(i), such that
hearing loss would constitute "substantial[] limit[ation]," 42 U.S.C. § 12102(1)(A). Finally, the
Appendix to this Part of the Code of Federal Regulations, entitled *Guidance on ADA Regulation
on Nondiscrimination on the Basis of Disability in State and Local Government Services*, notes
that whether one is disabled "should be assessed without regard to the availability of mitigating
measures, such as reasonable modification or auxiliary aids and services." 28 C.F.R. § Pt. 35,
App. B. In fact, the guidance uses hearing loss as an exemplar: "For example, a person with
hearing loss is substantially limited in the major life activity of hearing, even though the loss
may be improved through the use of a hearing aid." *Id.*[20] In sum, there can be no debate that
Plaintiff, based on the facts alleged, is a qualified individual under the ADA.

---

[20] "Because Congress explicitly authorized the Attorney General to promulgate
regulations under the ADA," *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 n.5 (1st Cir.
2000) (citing 42 U.S.C. § 12134(a)); *see also Noel v. N.Y. City Taxi & Limousine Comm'n*, 687
F.3d 63, 69 (2d Cir. 2012) ("As the House Judiciary Committee Report conceded, it is 'the
purpose of this section . . . to direct the Attorney General to issue regulations setting forth the
forms of discrimination prohibited'" (alteration in original) (quoting H.R. Rep. 101–485(III) at
52, reprinted in 1990 U.S.C.C.A.N. 445, 475)), the regulations "must [be given] legislative and
hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute,"
*United States v. Morton*, 467 U.S. 822, 834 (1984). The Court has no reason to find such
regulations improper, nor have Defendants argued otherwise.

b.  Discrimination

With respect to the third and final prong, again, the ADA provides that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (emphasis added).  The RA provides similarly.  *See* 29 U.S.C. § 794(a).  In light of the statutes' wording and resultant protections, ADA and RA claims must allege that the complainant "was . . . discriminated against *because of* a disability."  *Piedmont Behav. Health Ctr., LLC v. Stewart*, 413 F. Supp. 2d 746, 756 (S.D.W. Va. 2006) (emphasis in original).  Failure to do so is "fatal."  *Id.*  "A plaintiff may base [his] Title II claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation."  *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)); *accord Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144-45 (1st Cir. 2014) (detailing the same three theories by which a Title II claim can proceed).

It is not exactly clear by which avenue Plaintiff would have the Court traverse.  However, "no allegations support the belief that Defendants acted with Plaintiff's alleged disability in mind," foreclosing Plaintiff's ability to allege a claim under a theory of disparate treatment. *Doherty v. Bice*, No. 18-CV-10898, 2020 WL 5548790, at *7 (S.D.N.Y. Sept. 16, 2020).  The same cannot be said, however, under a disparate impact or a reasonable accommodation theory.

On a disparate impact theory, Plaintiff's allegations survive, albeit barely.  "To establish a prima facie case under a disparate impact theory, [a] plaintiff must demonstrate '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or

disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003)).  At the summary judgment stage, a plaintiff may be "required to include statistical evidence to show disparity in outcome between groups." *B.C.*, 837 F.3d 158.  But at the pleadings stage, where the Court now finds itself, "it is reasonable to expect that plaintiffs pleading disparate impact claims must [only] include at least one allegation that raises an inference of such disparity—one sufficient to put the defendants on notice regarding the basis for [the] plaintiffs' belief in a disparate effect." *See Doherty*, 2020 WL 5548790, at *7 (quoting *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013)).

Construing Plaintiff's claim liberally as it must, *Sykes*, 723 F.3d at 403, the Court finds that Plaintiff has cleared this bar.  A decision by a sister court in this district is instructive: in *Doherty*, 2020 WL 5548790, a state-run university, which was considered a public entity, issued no-contact orders against an individual where a fellow student accused the individual of certain conduct, thereby barring that individual from contacting the complainant.  *See id.*, at *1–2. Plaintiff, who suffered from Asperberg Syndrome, had multiple no contact orders issued against him, though the university's procedures barred Plaintiff from appealing those notices.  *See id.* The court found the university's facially neutral policy had a disparate impact on Plaintiff (and presumably similarly situated students), giving rise to an allegation of an ADA violation sufficient to withstand a motion to dismiss.  *See id.*  The same is true in this case.

The mechanism by which corrections officers give orders, namely orally and or through loud speakers, is an outwardly neutral practice, satisfying the first element.  Plaintiff essentially

claims that "due to [his] disability, [this practice] caused an adverse impact on Plaintiff." *Id.*
While the Complaint only mentions Plaintiff specifically, "it is a reasonable inference that
[prisoners] with his particular type of disability were adversely affected" in an analogous way by
Otisville's alleged practice. *Id.* While subsequent discovery may disprove Plaintiff's allegations
regarding the process by which orders are given as well as the actual impact it had on Plaintiff,
Defendants' Motion to Dismiss must be denied, as, "at this early stage, this claim is sufficiently
pleaded." *Id.*

Plaintiff's claim also meets this standard by the skin of its teeth on a reasonable
accommodation theory. "The ADA mandates reasonable accommodation of people with
disabilities in order to put them on an even playing field with the non-disabled," *Felix v. N.Y.C.
Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003), meaning that "[t]he third prong of
discriminatory conduct in violation of the ADA and Rehabilitation Act may take the form of a
refusal to afford a reasonable accommodation," *Schine*, 2017 WL 9485650, at *4.

In reasonable accommodation-based claims, "'[r]easonable' is a relational term: it
evaluates the desirability of a particular accommodation according to the consequences that the
accommodation will produce. This requires a fact-specific, case-by-case inquiry, not only into
the benefits of the accommodation but into its costs as well." *Fulton v. Goord*, 591 F.3d 37, 44
(2d Cir. 2009) (citations and quotation marks omitted).

Nonetheless, two cases decided by courts in this district persuade the Court that Plaintiff
has met this burden, particularly in the initial stages of early litigation when Plaintiff's burden is
least onerous. First, again in *Doherty*, Judge Román found that the university's failure to take
into consideration the plaintiff's Asperger Syndrome and its correspondent failure to

accommodate the plaintiff's disability within the greater no-contact order process were "sufficient to sustain a claim for a reasonable accommodation." *Doherty*, 2020 WL 5548790, at *8. Second, in *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1036–37 (S.D.N.Y. 1995), the court granted summary judgment for hearing-impaired inmates, having concluded that a prison facility's "failure to provide visual safety alarms" violated these twin statutes insofar as prisoners were discriminated against as being at higher risk in the event of fires or other emergencies.

The plausibility of Plaintiff's claims is apparent when set against the instances in which "[c]ourts [have] routinely dismiss[ed] ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. N. Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (collecting cases); *cf. Pfrommer*, 148 F.3d at 82 (dismissing ADA claim arising from reasonable accommodation theory where it was "clear that the plaintiff [wa]s in essence challenging the adequacy of his [Vocational Educational Services for Individuals with Disabilities] services, not illegal disability discrimination").

For example, in *Tardif v. City of New York*, 991 F.3d 394 (2d Cir. 2021), an arrestee sued the city, its police department, and police officers because the arrestee was not timely provided her epilepsy medication during her pre-arraignment detention following her arrest. *See id.* at 398–402. But, generally speaking, "medical services . . . were available to all pretrial detainees." *Id.* at 405. Thus, the core issue was whether the plaintiff "was denied medical services *because* she has a disability." *Id.* (emphasis in original). The Second Circuit related this back to prior precedent, too, noting that that court had previously "held that the Rehabilitation Act 'does not

create a cause of action based on a [disability] that is directly related to providing the very services at issue.'" *Id.* at 406 (quoting *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992)).

Had Plaintiff filed a claim under the ADA raising *only* the fact that he was not given adequate care, the case would fall squarely into the *Tardif* category and be correspondingly dismissed. However, because Plaintiff's claims, construed liberally, involve Otisville's policy of issuing orders audibly without any accommodation for hearing-impaired individuals, his Complaint is not such an end-run around the ADA, but rather, as alleged, a plausible instance in which Plaintiff's disability is not accommodated, leading to negative consequences in the form of disciplinary actions. In other words, Plaintiff's claim adequately alleges that via Otisville's discriminated against "*because* of his disability." *Lee v. N.Y.S. Dep't of Corr. Servs.*, No. 97-CV-7112, 1999 WL 673339, at *14 (S.D.N.Y. Aug. 30, 1999) (emphasis added).

It may well be the case that further fact development undermines Plaintiff's allegations. Discovery may show, for example, that Defendants have made such accommodations or that this practice does not, in fact, have an adverse impact on Plaintiff. Nonetheless, at this stage, Plaintiff has sufficiently alleged a violation of the ADA and RA. Accordingly, Defendants' Motion regarding such claims is denied.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Specifically, Defendants' Motion is granted with respect to Plaintiff's constitutional claims, while it is denied with respect to Plaintiff's ADA and RA claims. With respect to the former, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016)

(explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").  Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein.  The amended complaint will replace, not supplement, the complaint currently before the Court.  It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider.  If Plaintiff fails to abide by the 30-day deadline, the claim dismissed without prejudice may be dismissed *with* prejudice, and Plaintiff's case will go forward only on its surviving claims.

Additionally, as noted in the Court's July 17, 2021, Order, Plaintiff remains entitled to pro bono counsel should the Southern District of New York's Pro Se Office be able to secure counsel on Plaintiff's behalf.  (Dkt. No. 28.)

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 19), and to mail a copy of this Opinion & Order to Plaintiff's address listed on the docket. SO ORDERED.

Dated:   March 28, 2022
         White Plains, New York

_____
     KENNETH M. KARAS
  United States District Judge